Our next case on the call of the DACA is Consolidated, Case Number 115-130 and 115-131, Agenda Number 9, Hartney Fuel Oil Company et al. Appellees v. Board of Trustees of the Village of Forest View et al. Appellants. Counsel for the Appellant, please proceed. I see my time is up. We're always happy to hear from you, Mr. DeVito. And the other counsel as well. May it please the Court, Mr. Chief Justice, members of the Court, my name is Gino DeVito, and I'm speaking on behalf of the intervening defendants in this case, the Regional Transportation Authority, the County of Cook and the Village of Forest View. Paul Burks will be speaking on behalf of the state defendants and specifically the Department of Revenue. The very narrow issue in this case concerns whether or not the appellate court was correct in ruling, in deciding that retailers' occupation tax paid by Hartney Oil were properly paid in the Village of Forest View because that is where the purchase order acceptance occurred. The answer to that question is a resounding no. The appellate court was dead wrong in so holding. And it's wrong for three independent and significant reasons, each of which in and of itself would result in the reversal of this judgment. One, the regulations which the appellate court construed do not permit the construction that the appellate court gave it, that purchase order acceptance was the end-all and the be-all concerning this issue, that it was a bright-line single-factor test which had to be employed. No construction of the registrations could or should lead to that conclusion. The appellate court was wrong in construing the statute. Frankly, it hardly addressed the statute in saying that a purchase order acceptance test was the sole test to be applied in this case. And finally, whether this court accepts the conclusion of the appellate court that the purchase order acceptance test applies, the Hart v. would still not prevail because of the sham doctrine. What is so terrible about the conclusion of the appellate court in this case is that it reached the conclusion that a single factor was all that had to be considered and that a multi-factor, multi-fact test was inapplicable. What's worse is what they chose to involve the single factor test, which is the purchase order acceptance test, a test which is easily manipulable by retailers, as occurred in this case where Hart v. manipulated it for the purpose of creating appropriate tax payments. I've said that the construction of the regulations did not permit the construction that the appellate court gave, and that is absolutely the case. The appellate court relies upon the first sentence of what is generally referred to as B1 in the regulations. As Your Honors knows, there are three sets of regulations relating to the three enabling statutes involving the Counties Act, the Municipal Code, and the Regional Transportation Authority Act. The first sentence begins with qualifying language without attempting to anticipate every kind of fact situation. Clearly, the regulations say that every situation could not be anticipated. And then it says in general, before it says that the most important factor in the occupation of selling is the general acceptance of the purchase order. It doesn't say that that is the sole factor. It says it's the most important factor. But it doesn't list other factors to consider? I'm sorry, Your Honor. Does it list other factors that should be considered? No. And is that of significance in the interpretation? Well, what it does state, Your Honor, in A1 and in some of the regulations, it's B1, that, and I am quoting from that section, enough of the selling activity must occur within the metropolitan region or municipality or county, depending on the regulation and the enabling statute, to justify concluding that the seller is engaged in business within the metropolitan region or other region with respect to that sale. So that is clearly a multi-factor test based upon the occupation of selling, based upon what the statute says, which is the occupation of selling is what's subject to the retailer's occupation tax. Not only does the regulation say that, not only does the statute say that, but this court has said that. Seventy years ago in Accello. Has this court also said that it should be based on all the circumstances in each case? Exactly. What this court said 70 years ago in Accello is exactly what Your Honor said, that the business of selling is a composite of many activities, and ultimately the test is to consider the factual circumstances in each case. That's what this court has said, not only in Accello, but in numerous cases thereafter. And we know the appellate court has adopted that. As a matter of fact, the case that dissenting Justice Carter cited, Chem Ed, relies upon that Supreme Court decision, quotes it extensively, as we have done with each of the briefs we file. Clearly a multi-factor test is involved because this court has said so consistently for 70 years and thereafter. So to take a part of the regulation, which clearly has limiting language, which says that it may be the most important factor, but it's not the factor, and to conclude from that that that is the single factor, the binding factor, is most inappropriate. And it's a misinterpretation of not only the statute, but particularly the regulations, which the appellate court focused on. The appellate court didn't discuss the statute at all. Justice Carter mentioned it. Justice Carter mentioned the Accello case and the Chem Ed case and Marshall and Houcher, three cases which are extraordinarily important within the context of this case. Justice DeVito, does it make a difference for the purposes of where a seller is subject to task between an out-of-state seller doing business in Illinois and an Illinois retailer doing business in another county? Your Honor, many of the cases deal with interstate sales. And the direct answer to your question is absolutely not. The test that the Court has formulated applies whether it's out-of-state seller or out-of-county, out-of-municipality, out-of-region seller. There's no reason to distinguish the two. And the cases which involve out-of-state sellers, which this Court has decided, have nothing to do with the Commerce case. It has everything to do with the interpretation of the retailer's occupation tax, the original tax upon which each of the enabling statutes in our case is based. Did I answer your question? Yes, thank you. Regarding the statute, there's where the test is found. The statutory test is very simple. All persons, all retailers engaged in the business of selling tangible property at retail within the jurisdiction are subject to retailer's occupation tax. That's it. And this Court's holding in Accello and subsequent cases in interpreting that language to mean exactly that. The business of selling is the standard, the real test to be applied. But to determine where the business of selling is being conducted, the individual facts in every given case must be considered. That's the test. Not any single-factor test. The reality is that no one reviewing this record could possibly say that any business was going on in the village of Mark. The only thing that occurred there was this purchase order acceptance. And we argue, and I will argue, that that was a sham. But even if it weren't a sham, the business of selling was not occurring in Mark. There was nothing else going on. Everything related to the business of selling was occurring in Forest View. Everything. Acceptance. You used the word acceptance. Was the term acceptance by the fact that it was sent by a fax machine to a place, or is acceptance someplace else? Well, it's a great question, Your Honor, because in essence, Mark was nothing more than a fax reporting place and, as Justice Carter said, a mailbox. Hartney set it up in such a way to appear that contract acceptance, purchase order acceptance, was occurring there. We all know that, you know, contracts consist of offers and acceptance. That's what makes the contract. So the sham aspect of this is that this was done without any economic benefit whatsoever to the company. None whatsoever. It was done solely and strictly for the purpose of evading taxes. The U.S. Supreme Court has numerous times referred to the sham doctrine. The Seventh Circuit and U.S. Courts of Appeal. This court tends not to use the exact words sham doctrine. This court uses the words of fiction, subterfuge, contrivance. Marshall and Houcher, Marshall and Houcher is the case which is right on point. Another case cited by the dissenting Justice Carter. And it's right on point. But your position, Mr. DeVito, doesn't, let me put it this way, this court doesn't have to find that this is a sham to agree with your position, right? It's absolutely right, Your Honor. If this court finds that it isn't a bright line rule and the mere having of a fax machine, if we think they were wrong in their assessment that having that fax machine would avoid the test, is that enough for you? Yes. For you to prevail in your argument. Yes, because what was going on in MARC was not enough, to quote the regulation, enough of selling activity. This was designed to give the appearance of that. And all of the selling activity truly occurred in Forrest's view. Nothing but this acceptance of these contracts by a part-time employee of a paint store who had no need to have any knowledge, she testified to that, any knowledge of the business of selling fuel oil, who had no discretion whatsoever. There was no business of selling going on at MARC whatsoever. It was all happening in Forrest's view. So even without the sham doctrine, I insist, however, Your Honor, that the sham doctrine truly applies to these facts and should be applied. Did the clerk in MARC have any authority to bind Hartney? Yes. Hartney asserted that what she did, and by the way, there was no real she, it was just, you know, an employee of the paint store who happened to be the person who tended to do this, that her acceptance bound Hartney. I see my time is up. I was going to say something about the purpose of the statute. Your time is up. Thank you, Your Honor. You had extra time to begin with. Thank you. Good afternoon. My name is Paul Burks. I'm a special assistant attorney general, and I'm representing the state defendants, Brian Hamer, the director of the Department of Revenue, and Dan Rutherford, the Illinois State Treasurer. I'm going to try not to cover the same ground that Mr. DeVito covered, as we're both on the same side, but there might be some overlap, I think, in our presentations. As Mr. DeVito pointed out, the question here presented is whether Hartney has to pay retail occupation tax to the jurisdiction where its business is located or to the jurisdiction where it accepted its purchase orders. The question is one of law. It depends on what the statutes require, what the regulations require, and the cases interpreting them. Are you accepting the fact that it was accepted in Mark? The trial court made that finding, that acceptance occurred in Mark, and the trial court made that finding for the reason that Justice Garland pointed out, was that when the order came into Mark, Hartney was bound to sell, and therefore that was acceptance. Now, that was disputed at trial. You know, the argument was that acceptance required a lot of different activities, and the actual authority was elsewhere. But that was the finding of the trial court, was that the final event that made Hartney bound to sell occurred in Mark. That was acceptance. On appeal, we haven't challenged that factual finding. What we're challenging, though, is the application of that fact to the application of the legal standard to that fact. Is acceptance alone where nothing else occurred in Mark? Is that alone enough to establish that Mark should pay retailers occupation tax in that locale? And that's what the appellate court's order, I think, squarely holds. It squarely holds that acceptance of a purchase order alone, when no other business or selling activities occur there, is where the retail occupation tax should be sourced. And that question of law is the one on which the appellate court erred. And because it's a question of law, I would like to start with the statute and talk a little bit about the cases and about the regulation implementing the statute. And those are the core documents where we find the answer to that question. Where should the local tax be sourced? So the statute, as Mr. DeVito pointed out, says those engaged in the business of selling. That's who has to pay. Those engaged in the business of selling in that local jurisdiction. And probably, I mean, that statute, that language has been in the Retailers Occupation Tax Act since 1933. And that language has been construed by this court many times. What does it mean to be engaged in the business of selling in one place? It means the business is located there. Not that the sale occurs there, that the business is located there. That's what it means to be engaged in the business of selling. Automatic voting machines says that very clearly. I mean, in automatic voting machines, it was a New York corporation that was selling voting machines to the Chicago Board of Election. And the Department of Revenue assessed them taxes on those sales to the Chicago Board of Election because they had personnel in Illinois that were selling. The machines were delivered, obviously, to Chicago. They had personnel who showed them how to set it up and use it. They made a bid, which was accepted by the city council. They accepted the bid here in Chicago. And the Department of Revenue said you have to pay Retailers Occupation Tax because you're engaged in the business of selling in Illinois. And this court said, no, you're not, because we're going to look at all your selling activities, just like this court instructed in XLO. We're going to look at the business and the details of the business and how the business engages in selling. And we see that there's more activities. The fundamental activities, billing and accounting, are taking place in New York. So the state of Illinois cannot impose a Retailers Occupation Tax on that seller. And it wasn't a question of interstate commerce. It was just a question of statutory construction. That seller was not engaged in the business of selling in Illinois, even though it made a bid, which was accepted by the Chicago City Council right here in Illinois, even though it had personnel in Illinois, even though it delivered to Illinois. It was not engaged in the business of selling here because the business was located elsewhere, even though there were some activities here. And that application of the statute is serial. I mean, it's consistent, beginning with XLO, including automatic voting. The First District applied that very analysis in a case called International Stanley in 1976, where you had a Nebraska corporation that sold grain doors to railroads. They accepted orders in Nebraska, but they built and stored their grain doors in Illinois. And the court said, I'll quote it here because I think the quote is important. It said, the greater portion of activities in connection with the retail sales took place in Illinois. The greater portion took place in Illinois, so they're engaged in the business of selling in Illinois. So that's the analysis that's been applied. Mr. Brooks, is it of any consequence that the Illinois Department of Revenue's audit manual tells auditors that the place of acceptance of purchase orders controls? It is not of any relevance for several reasons. One is that if you read the audit manual, all of the audit manual, I mean, if you read it in the record, not the whole audit manual, but what's in the record, what it says is here's a- Maybe sometime when I have a lot of time. I wouldn't even recommend it then. But if you look at the portion that's in the record, page 38 in the record, what it says is auditors, here is a quick reference guide for you to use when you're beginning your audits. Here's some issues that might arise, and we deal with them here in summary fashion. But if you want to, if you're going to assess somebody, read the regulations, read the statutes, read the cases before you, and use those as your basis to assess. So that's an administrative, the audit manual is for administrative ease. I mean, auditors will see the same issue many times, and it's helpful to give them the general rule that acceptance of purchase order is the most important single factor, and the audit manual says that. But the audit manual also specifically says, look, it's not going to be dispositive in every case. If you have a complicated case, look at the regulations, look at the statutes, use those. So that's just a very reasonable way to educate and instruct auditors for efficiency's sake. But it's not law. It's not binding law. And if you read it in context, it really does. Did the appellate court give any difference to the department's interpretation? The appellate court did not. Should they have, and should we? Well, as a general rule, if the department's interpretation of its own regulations is reasonable, then it should be deferred to. It's a question of law. And if the department's wrong, it's this court's obligation and duty and responsibility and authority to say so. So following up on what Justice Thomas asked you, are you saying, well, it's kind of confusing, so it is a question. It's not really clear, so it is up to us to decide the issue. Forget about what they said. Well, I think that the court should defer to the department's position as to what its regulation means. I think that if we've articulated a reasonable, coherent explanation of the cases and the statute and the regs, then the court should defer and say, we're the experts in the matter. We know what the regulations mean. But you're also saying that what it says in this manual, the audit manual, we shouldn't really put any weight on that. Well, it's not law is the thing. Because it's a question of law. I'm saying two things about the audit manual. I'm saying, one, it supports me. One, if you read the audit manual, it says, here's a quick reference, here's a summary guide. And it is a summary guide to say to auditors, generally speaking, acceptance of the order, of the purchase order, will be the most important single factor. That's what the regs say. And auditors, as a general rule, would be well-served to follow that. But it also says, be sure to look at the regs for complicated cases and don't rely solely on it. So it does support our position here that this is a sui generis, complicated case involving a taxpayer who has structured his business in a specific way to take advantage of the general rule. And our auditor, I think, wisely didn't rely on the general rule, but instead examined a selling act. That's my first point. But my second point is the legal point, which is to say, we're engaged in a de novo review of what the regulations mean and what the statute means. And what the department's internal audit bureau says about that really can't change, really can't affect. If this court has, as I pointed out, in six, seven cases in a row, this court and the appellate court, applied the same legal standard to what it means to be engaged in the occupation of selling, our audit bureau can't undermine that. They can't change what the law is through an internal document. So it has very limited usefulness in this inquiry right here, which is a question of what the law is. And even if you were to look at it, I think you would see if you read all of the paragraphs in context, that's page 38 through 40 of the record, that it does support our position that it's a case-by-case, fact-specific analysis that's required. So let me turn to the regulations then. I think I've talked a little about what the statute says and a little bit about what the cases have said interpreting that statute. And they have said, you do a fact-specific inquiry, look at all of the businesses selling activities and figure out where they're located based on, as the International Stanley Court said, where the majority of activities take place. So what do the regulations do? They really incorporate that standard, and they provide a little additional guidance to taxpayers. And on this point, I did want to refer back to a question that Justice Garmon asked. She said, are there any other factors besides acceptance of purchase order that are listed in the regulation? And Mr. DeVito, I think, correctly answered that in that section, in C1, there are not. But in D1, there are. So C1 of the regulation says seller's acceptance of order, and it lists acceptance of purchase order as the most important single factor. But then the very next section, D1, says here are some considerations that are not controlling, and it lists several others. It says delivery of the property, not necessary to have that in the jurisdiction. But clearly, it must be relevant. Otherwise, why would it be listed? Where the technical sale occurs, where title passes, not dispositive, or as it says, not decisive, but clearly relevant. So there are other factors in the guidance provided in the regulation that retailers are being informed that they should look at, some of which are more important than others. That's the nature of guidance. So what the regulation starts with, though, in Section B1, is the statement of the general rule, which is for the seller to incur the tax, the sale must be made in the course of engaging in business, and enough of the selling activity must occur within the jurisdiction to justify that conclusion, that the seller's engaged in the business. That's the test. Enough of the selling activity. That means under the case law, the predominant and most important activities, they occur in that jurisdiction. That's where the sale will take place. It goes on to then give the guidance to say we know this is a broad standard, essentially. We know that there's a lot of selling activities involved. We know it's fact-specific. Here are some factors you should think about when you're deciding where to source your sales. You should think about where you accept purchase orders. In general, that will be the most important factor. In general, if you do that, if you accept your purchase order in a specific place, we will conclude that you're engaged in the business there, in general. But specifically, we're not attempting to anticipate every kind of fact situation. Turn to D1 and D2. You should also consider where do you deliver the property? Where does the technical sale take place? And in the context of Accelo and all of those other cases, you should consider all of your selling activities to figure out where your business is located. So this provides guidance to taxpayers who want to determine where should they source their sales. Hartley wants to use it to determine how to get the lowest tax rate. They want to take the guidance that is provided to good-faith, bona fide retailers on where they should source their sales based on where their selling activities take place, and they want to take it out of context and use it as a way to avoid taxes. It wasn't intended for that. If read in context as a whole, it's consistent with the case law. It's consistent with 70 years of case law and with the Retailer's Occupation Tax Act. They can all be read coherently as articulating the same standard. A retailer must pay Retailer Occupation Tax where it's located. It's located where its predominant and most important selling activities take place. Here are some factors that you should consider to make that determination, including where you accept your purchase orders, where is delivery, where does the sale take place, where is your business located, where does billing take place. These are all factors that may or may not be important, depending on how the specific retailer is engaged in business. So the appellate court's one-factor test, it really isn't consistent with the regulation because you really wouldn't need sections B1, D1, or C1 if you had a one-factor test. What you would need is a single sentence that says, the department believes you're engaged in a business of selling where you accept your purchase orders, period. So it does undermine a lot of the guidance that's provided there in favor of simplicity. It's not consistent with the cases, all of which have interpreted the phrase engaged in the business of selling to mean a fact-specific test, starting with Excello and moving on through. And it's not consistent with the policy underlying the statute, which is to provide tax revenue to those jurisdictions that provide services. Thank you. I see I'm out of time. Thank you. Good afternoon, Your Honors. May it please the Court. Rob Hockman on behalf of Partney Fuel Oil. Before I get into the specific legal questions before the Court, and I promise I am going to march through the statute and this regulation at what might seem a tedious pace, because I am convinced that those regulations are absolutely compelling and dispositive in this case and support Partney's position. I just want to take a step back and address a general proposition, a background proposition that's important here. There's nothing wrong with a business structuring its affairs to reduce the tax burden on its customers. Partney did that in this case. It did it openly and in full view of the department. It was watched by the department, and the way it accounted for its tax treatment for years and years and years was okay by the department. And then they also at this trial explained why they do that. This is a very, very, very tight margin, price-sensitive business. Fuel marketing, fuel is a commodity. Customers go to the lowest seller. So they have to do everything they can within the bounds of the law. Within the bounds of the law to keep their prices low. Consider what happened. This isn't just Pete Hartney's testimony at trial. Consider what happened in this case. When the auditors announced that they were changing their minds about how Hartney should be treated, Partney had a decision to make. It's got to figure out what to do. Well, one decision it made, we're going to fight that audit determination, and here we are at the end of that long process hoping and expecting to win. But they faced a lot of uncertainty at that time. And what did they do? They packed up the Forest View administrative offices and moved them down to Mark because that was what they needed to do to sell fuel. And they've not hidden it, and they've not been embarrassed about it. So let's answer the question whether what they did and the way they structured their business was allowed by the law. And the third district opinion is taking, I think, a little bit of a beating for not discussing the statute. I think that's a little harsh on them because it turns out when you look at the statute and you look at the cases interpreting the statute, what you actually get is a question that the statute in those cases don't answer but the regulation does. And I don't think there was anything wrong with the third district ultimately focusing on the regulation because that's where you get the answer. Allow me to explain. Start with the statute. All three statutes have the same key phrase. You heard it today, engage in the business of selling. Well, what counts as engage in the business of selling? I'm not afraid of admitting that Excello and automatic voting machines understand the business of selling to be the composite of many activities. That's absolutely true. And they say that, in fact, they say as a standard, enough of the selling activities have to take place within a jurisdiction in order for it to qualify as engage in the business of selling, which raises the question, how much is enough? Excello doesn't answer that. Automatic voting machines doesn't answer that. Both of those cases just tell us what isn't enough. What they told us is that if you just, if you don't have a place of business in a jurisdiction, you just have some sales agents who are wandering around trying to drum up business with no power to bind the seller, each of those cases lack, they lack the power to bind the seller, then you are not engaged in the business of selling there. So it doesn't tell us what is enough. It just tells us that one small sliver of selling activity, if that's the only thing you do and you lack the power to bind, then you're not selling. And I think Mr. Burks misspoke about automatic voting machines. He referred to acceptance in automatic voting machines as having occurred in Chicago. That's not true. And this is, I'm reading from the end of the opinion. The Illinois activity consisted only of promotional work, delivery of bids, transfer of title, delivery of machines and servicing. And at the end of the paragraph there, it was in New York that the bid was prepared, terms were fixed, contracts executed, payments and billings made. In other words, acceptance occurred in New York in automatic voting machines, not in Chicago. So there is one case. There's exactly one case. It's one of their favorites, the ChemEd case that actually discusses what counts as enough. And I want to talk about what the facts of ChemEd were because I don't understand how they can embrace ChemEd in light of the standard they asked you today to adopt. ChemEd is a case of an Ohio seller. Everything that they do is done in Ohio. They don't have any, it's just like automatic voting machines. They have some sales agents here. They don't have a place of business where those sales agents operate out of. They try to drum up business, but all pricing, contracts, everything is accepted in Ohio. There is exactly one thing in Illinois. It's an inventory location. They had a warehouse in Chicago where some of the inventory was sent to Chicago-based, to Illinois-based purchasers. That, the question of ChemEd is, is that enough? And the answer in ChemEd was yes. Even that one sole activity in the occupation of selling, that's enough to be deemed under the statute engaged in the business of selling. So that leaves us with the following after we've read through the statute. We know that it can be one or any combination of a number of potential things. It's a very low threshold, and it raises the following question. What happens when an Illinois seller is engaged in the occupation of selling with respect to a particular sale in more than one Illinois jurisdiction? And there's not a single case they've cited that involves that question. Excel doesn't answer that. Automatic voting machines doesn't answer that. Even ChemEd doesn't answer that. This case is going to answer that. And, in fact, the regulation is where you have to turn to answer that. So now, if you want to follow along, this is going to be a little bit tedious. But you can turn to Tab 7 of the Plaintiff's Appellant's Joint Appendix. I'm using the county version, so the lettering and numbering will be according to the county version. It begins with the definition of county, which you can ignore because it's not an issue in this case. And it starts with Section B. And Section B, titled mere solicitation of orders not doing business, this simply adopts into the regulation everything that we've learned and already discussed this morning about the statute and the cases. It echoes the language of the statute, engaging in the retail business within the county. That's the first sentence of B1. Second sentence, enough of the selling activity must occur. That's the standard for whether you're engaged in the business of selling in a particular jurisdiction that we know from Accello and automatic voting machines. Next paragraph, subsection B2, goes on to express the holdings of Accello and automatic voting machines. What's not enough is if you don't, if you mere solicitation and receipt of orders within a taxing jurisdiction where the orders were subject to acceptance outside the taxing jurisdiction. Not enough. So we're still wondering. We're still looking. What's enough? What's enough? Section C begins with Mr. Brooks's favorite phrase, without attempting to anticipate every kind of fact situation. That's true. This regulation does not anticipate every kind of fact situation. But it does anticipate some fact situations. And it's about to tell you which one. It goes on, as you heard, to say that the place of purchase order acceptance is, quote, the most important single factor in the occupation of selling. Okay. So that sounds like if it's most important, surely it's enough to be engaged in the business of selling. And as we'll see, the legal commitments that they've made in this case require that they accept that conclusion. It's a matter of logic. Now, I'm going to keep going, because this paragraph in this regulation has more to say. Neither Mr. Brooks nor Mr. DeVito read further. They accused me of treating, accused us and Hartney of treating portions of this regulation as superfluous. That's not true. So we know that purchase order acceptance is the most important single factor. How important? The next sentence tells you. In no uncertain terms. It's a long, complicated sentence, but I'm picking up in the middle. Before you go through, Mr. Hockman, couldn't one of those unanticipated fact situations be what they now consider a Cook County business trying to avoid the Cook County tax by setting up a fax machine in Putnam County at a paint store to receive purchase orders? Well, Justice Thomas, I want to be clear about this. We did not just have a fax machine. We had a person down there. We had space designated as our space in the office. We had a dedicated fax line where she could receive orders. She had to make an evaluation of whether the people who submitted those orders were creditworthy customers of the company. And if they were not, she rejected them. She didn't just accept. It didn't happen very often, but it did happen. She had the power to reject as well, and she did. A fax machine can't do that. What if she accepted somebody she shouldn't have accepted? Were they bound? Absolutely. Unquestionably, and that is the absolute conclusion of this trial. We had a trial about this question. What is the appellate court decision? What's the import of the appellate court decision? Hartney received, I don't think you'd dispute, received the benefits and services provided by Cook County. I mean, their business, you would at least say, is primarily in Cook County, right? Well, I want to be clear before I answer that. I want to be clear about it. I'm not trying to catch you. No, no, no, no. I want to emphasize what I started with. Yeah. Remember, when that deal of the benefits of Cook County but not paying the taxes, when it even started to look like Hartney might suffer and have to pass on to its customers the burden of the taxes of Cook County, Hartney left, right? So Hartney's not trying to steal some kind of government services. Hartney's trying to comply with the law. Well, then back to just in a more general sense, back to this bright line rule. What would stop a number of Cook County businesses from doing the exact same thing that Hartney did here, presumably getting some of the benefits as they relate to the ROP, right? And what would that do to the economy of Cook County, for example? Wasn't that tax put in place to fund important services that Hartney and others are benefiting from? And now I think the opposing counsel will say all they have to do is set up a fax machine or have somebody put purchase orders in another county and pay the lower tax of the other county. I think the concern that the sky is falling and the finances of Cook County are going to sort of suddenly evaporate is way overblown in this case. This regulation has been in place for decades and decades. The PLRs that we cite and discuss that adopt this rule have been around for decades. There may be some industries. But this would be the first Supreme Court decision on this. That's right, and that might be a reason if somebody were to sit down and look at this regulation and say, boy, the world has changed. Business is more mobile than it used to be. Whatever factors they want to consider. And they think, you know what, this isn't going to work anymore. Then you change the regulation. Or you change the statute. You can do that. But what you don't do is you don't take an audit against a company that's been absolutely clear and its practices have been blessed expressly by the department in prior audits. You pull the rug out from under it, reach back in time, and retroactively impose $20-some-odd million in tax sum. You don't do that. So if there's a problem, nobody, this Court is not today saying the law in Illinois will always be purchase order acceptance takes place in Illinois. That's where retailers' occupation tax. This Court cannot do that because the General Assembly can address this. They can open a notice and comment proceeding. And we can have a proper airing of the concerns and the balances that you're raising, Justice Thomas. We can incorporate the views not just of the taxing jurisdictions, but of sellers, not just in one industry, but all industries. Of buyers all across the state. And we can try and figure out what is a better tax rule rather than groping around in litigation, asking a court in a single case to adopt an anything-goes view that the department can look at in hindsight and say, yeah, this one looks like there's a little bit more going on here and a little bit less going on there. I think that's a disaster for business and for giving people the opportunity to order their arrangements, price their products, and effectively compete. But that's a policy point. And is that another portion of your argument? Somewhat of an estoppel argument at least? I mean, we do raise that. And I don't think you need to get there. Because I think, and as I was about to do, I think if you apply this regulation as written, you're done. You don't have to do further. You can put it in the lap of the General Assembly or the Department of Revenue in a rulemaking proceeding to figure out whether they can live with this. But let's continue. I don't want to overlook this sentence, the next sentence in C-1, because it's the sentence that declares the rule. We left off. We wanted to know how important purchase order acceptance is. We're told if a purchase order that is an acceptance of the seller's complete and unconditional offer to sell is received in the jurisdiction, then that jurisdiction's tax applies. It's unqualified. It's not hedged. It doesn't say, well, I mean, unless we take other things into consideration. It just declares it. If what was supposed to follow from without attempting to anticipate every kind of fact situation was something about purchase order acceptance being important but not necessarily dispositive, you couldn't write this sentence. You couldn't write it. They haven't said anything about it. They got up. They spent a half an hour this morning talking about the regulation, the faithfulness of the regulation. You didn't hear them read it. Going on, because I'm not going to be accused of that. The last sentence, it actually punctuates the point because it creates an evidentiary presumption about acceptance. Receipt, we're going to assume receipt is where acceptance takes place. Justice Burke, we had a trial about this. That's what the trial was about, actually. The auditors believed that acceptance didn't take place in Martin. And we had a long, hard-fought, difficult trial. The trial judge made findings, and those findings cannot be in our challenge here anymore. That's done. Acceptance took place in Mark. Partney was bound as soon as Lori Seraiso or the other sales agent said Partney accepts this offer. Now, we think that answers the case, and they accuse us of treating the regulation, the rest of the regulation, as superfluous because we think you can stop there. But that's wrong, and let me explain. Think of it as like a road. You're on the road. You're a seller. You're engaged in the business of selling in Illinois. You have to figure out what jurisdiction sales applies. The first offering, purchase order acceptance. Do I accept purchase orders in Illinois? I get off, and I'm done. But that doesn't mean the rest of the road is superfluous. We get on I-55 and we drive down to Springfield. It doesn't mean that the rest of the road from get off at Springfield and the rest of the road goes on to St. Louis is superfluous. Of course, there are lots of people going to St. Louis. And, in fact, this road continues because some sellers might not accept purchase orders in Illinois. Remember Kemet, their favorite case. That's a seller that didn't accept purchase orders in Illinois. The road goes on, and the next paragraph of the regulation says if a purchase order is accepted outside the state, but the inventory that's the subject of the sale is in the state, then that places. Sales tax applies. So this is another circumstance that they did anticipate. They haven't anticipated everything, but they did anticipate these two. Purchase order acceptance, Hartney takes that exit. Inventory location with purchase order acceptance outside, Kemet takes that exit. Then we go on. Some considerations that they're not controlling. Mr. Burks pointed this out. What are they doing there? Well, at this point, we don't know what's going to happen. If you don't accept purchase orders and you don't have inventory located in the state, then it's a little bit more uncertain. In other words, they haven't attempted to anticipate every kind of fact situation, just like I promised and just like they told us they hadn't. And what they give us are some things that sellers might think they could rely on, and they're telling them don't be so sure. And in some cases, actually, they're telling them they don't count at all. Is that why your analysis of the language that says without attempting to anticipate every kind of fact situation that may arise in connection, it is the department's fault? Right. That's right. And so you're saying this is what you're talking about. That's exactly right. That's exactly right, Your Honor. And so that's the regulation. We see that where the delivery of the property goes may or may not be another off-ramp. We learn, for instance, that where the property is used or consumed is actually immaterial. This isn't just telling us that other factors might matter. It's actually telling us some factors that affirmatively don't matter. We're trying to give some guidance. to help them see that you might, when you're in that indeterminate zone, Justice Garmon, you're not as clear as you purchase order acceptance in Illinois or inventory in Illinois with purchase order acceptance out of Illinois. We're going to give you a little bit of guidance so that you have some sense of where this is going to go. Now, you know, as I said, I think that's all you need to know. The regulation and the statute are in harmony. The statute and the cases leave a question unanswered. What about a seller that is engaged in the business of selling in more than one place? And the regulation definitively answers that. But they press on with their view, and you heard it again this morning, that, in fact, there's only one place where Harden was engaged in the business of selling in Illinois because it wasn't engaged in the business of selling at all in MARC because all it did in MARC was accept purchase orders. I submit to you that cannot be right if, as they believe, KEMED was rightly decided and if, as their regulation states, the purchase order acceptance is the single most important factor in the occupation of selling. Remember, in KEMED, the only activity that stood alone was the location of the inventory sold to Illinois purchasers. That's it. Just that one. They accept, agree, and the regulation, as I just explained, is clear. That is enough selling activity. They also do not run from that first sentence of C-1 of the regulation where they say the single most important activity is purchase order acceptance. How can a less important activity, standing alone, be enough selling activity to qualify as enough activity to be engaged in the business of selling, but the most important factor is not? This isn't just all their other prior statements that they've run away from in their brief. These are legal commitments they continue to make and accept in their brief. And I think the weight of their own arguments causes their ultimate conclusion to collapse. Of course, that's not all. As I said, there's a lot more that HARTNEY had at its disposal. The PLRs that are listed in the brief, many of them. I know that they only apply or are only controlling as to the sellers, but what we're talking about here is whether this statute so constrains the department that it cannot have adopted the regulation that means what this regulation says, that purchase order acceptance is enough in Illinois to determine where the sales tax applies. And we see PLR after PLR after PLR describing in greater and lesser detail all kinds of different business arrangements. Some of them, quite a bit like HARTNEY, where the only thing you learn about a sales acceptance office that is separate from administrative offices and other headquarters is that they accept purchase orders there. A 1991 PLR has such an office in the tiny town of Abilene, Illinois. 2001 PLR has an office of a jet fuel subsidiary whose office is described not as anything other than accepting purchase orders, separate from the headquarters. And the department says the same thing time after time. If this is the location where purchase orders are accepted, that location's sales tax will apply. The Burridge audit, I haven't talked about that yet, but that was an audit. They say it was about the motor fuel tax. It's not exactly right. It was about the motor fuel tax. But it was also about the retailer's occupation tax. And not only did they take the position in that case and explain the rationale of their position that purchase order acceptance determines where a retailer's occupation tax applies, they said this, and I'm reading now from PX17, it's their memorandum of law to the administrative law judge during the audit. There was also an existing body of regulations and case law that applied to the ROTA. Included in these rules and law is that the location of purchase order acceptance is used to determine the location of the ROTA and other local occupation taxes, including the three taxes at issue in this case, county tax, municipal tax, and the ROTA tax. I'm going to emphasize that first part again. Existing body of regulations and case laws. I didn't write that. I didn't say purchase order acceptance was dispositive in 2001. They did. And they said it in a live audit, seeking millions of dollars from Hartney for motor fuel tax and retailer's occupation tax. This is the standard that they've been applying for years. And for them to come in and say that what they've been doing in telling taxpayers all this time, telling local governments to this day is going to be dispositive, telling their own auditors, as you heard this morning, about how to do audits, that all of that has been wrong, something nobody should have relied on. I think that's a remarkable statement and a little bit, at a minimum, should raise red flags about the interpretation of a fairly open-ended phrase of a statute engaged in the business of selling. I want to just speak briefly about the RTA's argument not embraced by the Department of Revenue that the transactions were a sham, that acceptance was a sham. I think there's a reason why the Department doesn't address it and doesn't accept it. It's because, as I said, Justice Berg, we had a trial. And we fought this out. And this was real. This acceptance was real. And the sham cases bear no resemblance. Sham cases involve complicated, multi-party transactions through which you're sending real estate or something like that through a divorce to try and escape a preexisting tax liability. That's not the transfers of property. This is a single transaction. There's a seller and a buyer. Acceptance has to be somewhere. We had a trial to determine where it occurred. If the Department, part of the reason I think the Department doesn't go down this road is because if it's true that purchase order acceptance in Illinois is dispositive, think about what it would mean for purchase order acceptance legally determined to a trial to be nonetheless subject to challenge as not real. It just doesn't make any sense. This is a single transaction. There's only one question that was dispositive here, and it was decided. Ultimately, I think I'm just going to conclude where I started, Your Honors. Businesses need to be able to price their products to compete, and they have the right to rely on the published statements and regulations of tax officials when they order their affairs. They're not fixed forever. They can be changed. If there's a problem, it can be addressed. And it should be addressed in a reasonable way that incorporate the views of the interested public and ultimately and importantly have only prospective effect, only reach forward in time so that businesses can order their affairs and make good faith efforts to compete while complying with the law. That's due process. That's fairness. For all those reasons, Your Honor, we respectfully request that you affirm the judgment in court of appeals. Thank you, Mr. Hackman. Thank you. I'm going to start my rebuttal by actually clarifying something I said earlier in response to a question to Justice Garman, a question that Justice Garman asked. I'm going to rebut myself first. I think I misunderstood the question. The question was, how can we both ask for deference for the Department's view and at the same time disavow the audit manual? And I think I didn't fully answer that question, so let me go at it one more time, which is to say that I believe the Department's properly promulgated regulations interpreting a statute and its interpretation of those regulations is entitled to deference. But that deference does not extend to every missive or every paper that the Department puts out. And there's a reason for that. I mean, the documents that become properly promulgated regulations go through a lot of review. There's notice and comment. They're like statutes. They're interpreted like statutes. Our audit manual, I mean, while there's obviously internal review on those documents, those are not law. They don't become law. And the level of deference is not the court's deference as to what those say about the law. The deference to the Department doesn't extend there. So that's just an addendum to my earlier answer. And now turning to Harding's presentation, let me talk about some of the cases that they cited. Automatic voting. The Department's position in automatic voting, which the Department lost that case. They wanted to impose the retail occupation tax on these sellers of voting machines to the Chicago Board of Election. The Department's position was that when the bid came in to the Chicago Board of Elections and the board said, yes, we'll take it, that was a contract. That was the Department's position and, therefore, that they were selling here. And the court said about that argument, we cannot say that the mere execution of a contract in this state is sufficient to classify the parties engaged therein in the business or occupation of selling tangible personal property at retail. So our argument was rejected that the acceptance of an order in Illinois makes it an Illinois seller. Now, they later on, in the opinion, as Mr. Hockman pointed out, they said in any event there was still more negotiation that had to go on and the final, final acceptance took place in New York. So that's correct. And I'm sorry if I left the wrong impression, but one of the holdings of that case that I just quoted for you is that the mere acceptance of that contract in Illinois is not sufficient if the predominant and majority of the selling activities are taking place in New York. Well, Mr. Burke, you said there was a finding by the trial court that the acceptance in MARC was the, and you conceded that it was the acceptance? Well, we didn't concede a trial, but we lost. So, yes, on appeal, we have not challenged the factual finding that the, you know, the final and dispositive action in committing Hartney to the sale occurred when their agent, the employee of Putnam County Painting, received the call. So that's a factual finding. But what that factual finding means for the, when the regulations apply to it, I think is the legal question that were presented. So turning to the second case that Hartney relied on during this presentation was ChemEd. And Hartney apparently interprets ChemEd to be a single-factor test, but the court in ChemEd didn't say that. They said exactly the opposite. In fact, the argument in ChemEd, ChemEd's argument was, how could you impose a tax on us in Illinois? All we do is hold inventory there. All of our selling activities are in Ohio. Look at XLO. You need a multi-factor test. You need to look at the specifics of our business. You need to look at the business of selling in Ohio. And the court agreed. They said, yes, under XLO, the Occupational Tax Acts require a composite of many activities before local tax liability might be imposed. And then the court went on to say that we think the holding of inventory in Illinois and the delivery, the driving of that inventory from the Illinois warehouse to the Illinois purchaser, that is enough of a composite of activities with deference to the department's regulation, because the department's regulation said that if you hold inventory in the state, then you're subject to road it to the Retail Occupation Tax Act. So the argument from ChemEd at the time was the department's regulation is null and void because it's inconsistent with XLO, because XLO requires a fact-specific test, and the department in their regulation has imposed a single-factor test, and that's null and void. You have to strike the regulation, and the trial court did. And on appeal, the appellate court said, no, it's consistent with XLO. You can't have just one factor. You have to have multiple factors, and we have it here. Now, you could quibble about whether that was rightly or wrongly decided, but that was the court's reasoning, was, yes, we agree. You need multiple factors in order for the local tax act to be applied. And they even go on to talk about the very provision that we're talking about here, Section B1. It enlists acceptance of purchase order as the single most important factor, however, does not attempt to anticipate every kind of fact situation. So let me turn to that regulatory interpretation which Hartney's counsel spoke about, the second sentence of Section B1. This is the smoking gun sentence, so to speak, which says if purchase order is accepted there in one place, then that's where retail occupation tax applies. Read the second sentence in the context of the first. It's not – there's no secret here. We're not running away from it. The first sentence says, in general, acceptance of the purchase order is the most important, and the second sentence says, therefore, in general, if you accept your purchase order in one place, you will incur the tax in that one place. But it's still modified by the first sentence. I mean, it's all one paragraph. In general, this is the most important. Because it's the most important, in general, it will be dispositive. But it is not always dispositive. What Mr. Hockman said is that, no, that in general, that qualifying phrase, it really doesn't modify the second sentence of B1 – or C1, rather, I'm sorry. It actually modifies a separate subsection back in D. That what we're saying in the first sentence of C1 is that – is to modify – is to allow – I mean, if I understood his argument correctly, it's to allow retailers who don't accept purchase orders anywhere. Because under his argument, if you accept in Illinois, that's where you pay. If you accept out of Illinois, you pay in inventory. So what does a retailer who doesn't accept a purchase order anywhere have to do? And his argument is, well, we're modifying Section D1, which talks about all the factors. But that's an irrational way to write a regulation. The most normal, regular reading of the regulation supports us. Unfortunately, I have very little time left. So I'm just going to hit my most important point, which I think is the PLRs. Mr. Hockman waves off the PLRs. Oh, they're not binding except on taxpayer. It doesn't say – the regulation doesn't say that. It says nobody can cite them or rely on them for any purpose. That's what the regulation says. You cannot cite or rely on a PLR that's outdated or a GIL for any purpose. So I assume there's an exception, and I can cite them in rebuttal to someone who's violated the regulation. And I will point out that each one of those is, of course, distinguishable. The 91 PLR had a full-time employee in that separate – not an agent of a paint store. They actually represented to the department that there was significant administrative and personnel costs that were being saved, not just tax avoidance. So you could go through them one by one if you wanted to, but you shouldn't because they're PLRs. They're hypothetical. They're advisory opinions. They're only binding. They're only relevant to the single taxpayer. Finally, the Burr Ridge audit. And I know there are factual disputes, and this has been briefed a lot. So I just want to talk about the legal consequence. What if the department really did what Mr. Hockman says and actually approved this structure? It means nothing legally. All right? And the facts are disputed, and if you look at the briefs, you'll see we have other arguments. But if the Burr Ridge audit, if we did what Mr. Hockman said, it means nothing legally. When this court looks at the regulations and the statute and determines what the law is, the conclusion of that is either the audit this time was right or the audit last time was right. That's all it means, right? Because the real answer comes from the regulations and the statutes. And you can't defer to an audit that took place in 98 over the audit that took place now that we actually have in the record. And the administrability of that would be impossible because if every prior audit could be brought up 10 years later in subsequent litigation, we'd be spending all our time litigating the last audit and seeing how it's consistent with this audit. And that's why there's well-established rules against stopping the department, stopping the state from properly collecting revenues based on prior audits or prior representations. Thank you. Thank you. Case numbers 115130 and 115131, Hartley Fuel Oil Company, et al., I believe, and the Board of Trustees of the Village of Forestview, et al., appellants, is taken under advisement as agenda number nine. Mr. Marshall, the Illinois Supreme Court stands adjourned until September 17, 2013, 930 a.m.